Pamela M. HERTZLER, Appellant
(Plaintiff),

v.

Dean B. HERTZLER, Appellee
(Defendant).

No. 94–262.

Supreme Court of Wyoming.

Dec. 18, 1995.

Rehearing Denied Jan. 10, 1996.

Susan Laser–Bair of Holland & Hart, Cheyenne, Wyoming; and Susan J. Becker, Cleveland, Ohio, for appellant.

James A. Eddington of Jones & Eddington Law Offices, Torrington, for appellee.

Daniel G. Blythe of Rogers, Blythe & Lewis, Cheyenne; Carolyn F. Corwin and Donald R. McMinn of Covington & Burling, Washington, D.C.; and James L. McHugh, Jr., General Counsel, and Dort S. Bigg, Director, Legal Affairs, American Psychological Association, Washington, D.C., for Amici Curiae American Psychological Association and Wyoming Psychological Association.

Marvin J. Johnson of Edwards & Johnson, Cheyenne; Beatrice Dohrn, Legal Director, Lambda Legal Defense and Education Fund, New York City; and David J. Cynamon, Elizabeth A. O'Brien, and Teresa L. Diaz of Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for Amici Curiae Lambda Legal Defense and Education Fund, The National Center for Lesbian Rights, The American

Civil Liberties Union, The Wyoming Chapter of the American Civil Liberties Union, and United Gays and Lesbians of Wyoming.

Before GOLDEN, C.J., THOMAS, MACY, and TAYLOR, JJ., and GUTHRIE, District Judge.

TAYLOR, Justice.

The parties in this appeal ask us to resolve a child custody dispute arising from completely divergent lifestyles of the mother and father. The district court granted the father's petition to modify the visitation schedule and limited the mother's visitation.

We affirm.

## I. ISSUES

Appellant, Pamela M. Hertzler (Pamela), posits the following issues:

A. Whether the trial court erred in determining that plaintiff exposed her children to inappropriate sexual behavior, thereby creating a substantial change in circumstances which vested the court with jurisdiction to entertain Defendant Dean Hertzler's petition to modify the custody and visitation Stipulation and Order of February 26, 1992.

B. Whether the trial court erred in determining that the best interests of the children are served here, and in every case, by limiting visitation between the children and their gay or lesbian parent to a de minimis level.

Appellee, Dean B. Hertzler (Dean), states the issue as:

1. Did the trial court abuse its discretion by granting the Appellee's petition and request for supervised visitation of Appellant with the parties' minor children?

The American Psychological Association and Wyoming Psychological Association filed an amicus curiae brief identifying the issue as:

Whether the trial court erred in holding that a mother's involvement in an open lesbian relationship provided an independent basis for restricting visitation with her children.

The Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, the American Civil Liberties Union, the Wyoming Chapter of the American Civil Liberties Union and the United Gays and Lesbians of Wyoming filed an amicus curiae brief in support of appellant and identified the following issues:

A. Whether the trial court erred in severely restricting Pamela Hertzler's visitation with her children based solely on the fact that she is a lesbian and without any evidence that her sexual orientation would harm her children.

B. Whether the trial court abused its discretion in concluding that the Hertzler children were "eroticized" based on its disapproval of Pamela's lesbianism and its determination to credit the testimony of an expert who admitted that his conclusions were influenced by the mother's sexual orientation; and whether the trial court further abused its discretion in assuming that when a lesbian parent is open and honest with her children about her sexual orientation, and displays affection, just as a non-gay parent commonly does, she "exposes" them to behavior that is sexual and inappropriate.

## II. FACTS

Married in 1976, but unable to conceive children of their own, Dean and Pamela Hertzler adopted a baby boy and, a few years later, a baby girl. Less than two weeks after the second adoption became final, Pamela took both children and left Dean, filing for divorce. Incorporated in their divorce decree was Dean's stipulation to Pamela's primary custody of the children, expressly conditioned upon her disavowal of lesbianism and subject to his liberal visitation rights.

In late 1991, less than a year after the divorce and against their daughter's wishes, Pamela's parents informed Dean that their daughter was, indeed, a lesbian. Following that revelation, Pamela quickly acquiesced in transferring primary custody of the children to Dean, subject to her liberal visitation rights. By that time, Pamela had entered into an open and ongoing lesbian relationship

with Peggy Keating, relocating to Lakewood, Ohio.

Dean availed himself of a match-making service to seek the affections, via letters and telephone calls, of Christine Thompson—herself a divorcee. In November of 1992, within two months of Dean's first letter, Christine came to visit Wyoming. An attraction quickly developed and was later consummated in marriage.

Insisting that she is a firm believer in Biblical principles, Christine manifested a strong desire to inculcate the children with those values. She convinced Dean that such a program should be pursued with a vengeance, eventually to include close questioning of the children about the details of Pamela's lifestyle, conducted amidst unrelenting exhortations against the perceived sins of Pamela.

With equally ill-conceived ardor, Pamela insisted upon fully informing the children as to her lifestyle. When visiting Ohio, the children "snuggled" with Pamela and her companion in bed; marched with the couple in a gay/lesbian rights parade; and participated in a "commitment" ceremony uniting Pamela and her new companion. Upon returning to Dean from such a visitation with Pamela, the children brought home an astonishing grasp of anatomical terminology, their articulation of which served only to deepen and reinforce Dean and Christine's leaden fears concerning activities which were taking place in Pamela's new home. Finally, driven by those dark fears, Dean obtained stringent modification of Pamela's visitation privileges, from which Pamela timely prosecutes this appeal.

The record is full of Dean and Christine's judgmental recriminations against Pamela's new life. On the other hand, the record is equally replete with Pamela's intensive and unrelenting efforts to immerse the children in her alternative lifestyle, seemingly to the point of indoctrination. As a consequence, we are asked to referee a contest between these protagonists of antithetical lifestyles. The manifold perils of such an exercise include the danger that we might superimpose our discretionary sensibilities upon those of the district court.

With equal and opposing force, each party vilifies the other's views and habits, inviting a decision rooted in the lifestyles of the parents rather than in the best interests of the children. In fact, we are unimpressed with the prejudice and condemnation heaped upon Pamela's lifestyle by Dean and Christine and remain equally dubious of Pamela's compulsion to relentlessly expose the children to every aspect of her relationship. Taking note that restrictions on Pamela's visitation have been eased during the pendency of this appeal, we eschew relative value judgments on the parents' respective lifestyles in favor of a decision based upon the best interests of the children, made with due regard for the sound discretion of the district court.

## III. DISCUSSION

### A. STANDARD OF REVIEW

The court entering a divorce decree retains jurisdiction to enforce or modify orders affecting child custody, visitation and maintenance as the interests of the children and the circumstances of the parents may require. Wyo.Stat. § 20-2-113(a) (1994); *Jacobs v. Jacobs,* 895 P.2d 441, 443 (Wyo. 1995). Jurisdiction to modify such orders is properly occasioned only upon a showing of *substantial* change in the circumstances affecting the welfare of the children. *Mulkey-Yelverton v. Blevins,* 884 P.2d 41, 43–44 (Wyo.1994). The burden of demonstrating such a change is on the party seeking modification. *Thompson v. Thompson,* 824 P.2d 557, 559 (Wyo.1992) (*quoting Goss v. Goss,* 780 P.2d 306, 312 (Wyo.1989)).

Custody and visitation decisions necessarily summon broad discretionary authority in the district court. *Love v. Love,* 851 P.2d 1283, 1286 (Wyo.1993) (*quoting Gaines v. Doby,* 794 P.2d 566, 570 (Wyo.1990)). Adversarial enmity frequently forces the mantle of Solomon upon such courts. Sadly, even Solomonic wisdom becomes folly between parties seemingly prepared to subordinate the best interests of their children. The atmosphere in such cases is generally so charged, the decision so daunting, and accurate assessment of the character of the con-

testants so pivotal that we defer to the superior evidentiary perspective of the district court in custody and visitation decisions absent a clear abuse of discretion. *Goff v. Goff*, 844 P.2d 1087, 1092 (Wyo.1993).

Employment of judicial discretion is a definitively subjective exercise. Appellate review, however, probes the logic and soundness of discretionary decisions in light of more objectively measurable evidentiary underpinnings. *Mintle v. Mintle*, 764 P.2d 255, 257 (Wyo.1988) (*quoting Martin v. State*, 720 P.2d 894, 897 (Wyo.1986)). The propriety of discretionary decisions is a function of ascertainable factual circumstances processed in a manner which is neither arbitrary nor capricious. *Mintle*, 764 P.2d at 257. Reasonable conclusions based upon evidence of record will not be disturbed on appeal. *Thompson*, 824 P.2d at 559. Furthermore, judgments supportable upon application of sound legal analysis to *any* grounds of record are equally inviolate, notwithstanding the district court's choice of a flawed approach predicated upon disparate factual underpinnings. *Ferguson v. Ferguson*, 739 P.2d 754, 757–58 (Wyo.1987). Reversal is required only when the district court's judgment exceeds the bounds of reason or constitutes an error of law in light of the entire record. *Combs v. Sherry–Combs*, 865 P.2d 50, 55 (Wyo.1993).

### B. EXPERT TESTIMONY

Dean and Pamela both called expert witnesses to bolster their cases. The district court rejected testimony of Pamela's experts, finding it neither particularly useful nor credible. Our deference to that decision cannot be extended to the district court's inappropriate reliance upon the testimony of Dean's expert, Mr. Rhodes. Mr. Rhodes' categorical bias against homosexuality, compounded by truncated professional experience, necessarily relegate his views to the dubious stature reserved by the district court for the opinions of Pamela's experts.

Entirely discounting the "expert" testimony, we nonetheless discern a substantial basis in the record upon which to sustain the district court. Searching the record for abuse of discretion, we cannot say, under the circumstances revealed, that the district court's decision was either arbitrary or capricious. *Mintle*, 764 P.2d at 257.

### C. SUBSTANTIAL CHANGE OF CIRCUMSTANCES

Dean's threshold obligation was to show a substantial change in circumstances sufficient to restrictively modify Pamela's existing visitation privileges. *Thompson*, 824 P.2d at 559. Although accomplished by indirection, in a fashion which implicated Dean and Christine in wrongdoing as much as Pamela and her new companion, we nevertheless find that the children's circumstances had changed substantially, to their detriment, so that their best interests required *some* kind of court action.

Before assessing the record's manifestations of changed circumstances, we must address a fundamental flaw in the analysis articulated by the district court in its decision letter:

> The state has an interest in perpetuating the values associated with conventional marriage, as the family is the basic cornerstone of our society. Homosexuality is inherently inconsistent with families, and with the relationships and values which perpetuate families.

The position of the family as the cornerstone of our society is a proper subject of judicial notice. *See* Laurence H. Tribe, *American Constitutional Law* § 15–20 at 1414 (2d ed. 1988). We are not, however, inclined towards exclusion in defining the family unit, particularly where the care and nurturing of children is at issue. *See, e.g., Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 504–05, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (quoted with approval in *DS v. Department of Public Assistance and Social Services*, 607 P.2d 911, 922 (Wyo.1980)).

Whether or not Mr. Rhodes merits recognition as an expert witness, his acknowledged homophobic bias vitiates any value his testimony might have as a factual basis for the district court's critique of homosexuality. Nor can reliance be placed on the harsh and judgmental "fundamentalism" of Dean and Christine. Absent evidentiary un-

derpinnings or persuasive precedent, we conclude that the district court indulged an essentially personal viewpoint in derogation of Pamela's lifestyle.

■ There cannot be found, in the district court's improvident expression of personal views on homosexuality, indices of malice or prejudice sufficient to cast doubt upon that court's capacity to remain " 'open to the conviction which evidence might produce.' " *Basolo v. Basolo*, 907 P.2d 348, 353 (Wyo. 1995) (*quoting Cline v. Sawyer*, 600 P.2d 725, 729 (Wyo.1979)). Notwithstanding the unrelenting insistence of the parties and amici, parental lifestyles remain of secondary import to the paramount interests of the children. Error in expression of personal beliefs cannot gainsay a district court decision which clearly promotes the children's best interests.

■ The district court also held that the children had been "eroticized" during their visits with Pamela, finding that this "eroticization" manifested itself in subsequent inappropriate sexual acting out behavior. The decision to restrict Pamela's visitation was largely predicated on the detrimental effects attributed to that "eroticization."

We respectfully refuse to elevate "eroticization" from its dubious rank as a solipsistic contrivance of the erstwhile expert, Mr. Rhodes. Absent that spurious denomination, however, it remains clear that *both* parties deliberately seized the opportunity of their divorce to ostentatiously embrace conspicuously divergent lifestyles, to the great detriment of their innocent children. The children's subsequent sexually charged and inappropriate behavior is a consequence of both parents' thoughtless insistence upon making their offspring the focal point of an acrimonious lifestyle debate. Already suffering the ill-effects of the divorce, the children were proselytized by Pamela on one side and Dean on the other as if their souls were a grand prize in a strange and destructive parental contest.

Precedent abounds, of course, concerning failed marriage partners whose love for their children is exceeded only by a mutual appreciation for the exquisite pain to be inflicted by manipulating custody and visitation rights as weapons of retribution. Dean and Pamela are hardly unique in this regard. More unusual is a lifestyle clash so intense and detrimental to the children that it rises to the threshold of a substantial change in circumstances. Whether or not they have been "eroticized," these children have certainly suffered abuse from both parents.

Initially, Pamela's custody of her children was predicated upon her disavowal of homosexuality. When it became clear that this was not the case, she voluntarily relinquished custody of the children to Dean in exchange for liberal visitation privileges. Pamela's capitulation did not quell the righteous fires burning within Dean and Christine, who felt compelled to instruct the children that Pamela had abandoned them for the affections of another woman, embracing a lifestyle which was a sin and abomination.

Pamela, of course, understood that Dean's aversion to lesbianism antedated his union with Christine. Pamela, on her part, insisted upon familiarizing the children with every aspect of her newfound existence, "snuggling" with the children and her companion, enlisting the participation of the children in a gay/lesbian rights parade and her "commitment" ceremony. Their son was particularly confused by seemingly irreconcilable conflicts between Dean's remarriage and Pamela's commitment.

■ In their efforts to wound each other, Dean and Pamela continually placed the children at sword's point. No one, least of all the parents, should have been surprised when the anguish and confusion of those innocents began to find expression in untoward acting out behavior. Such inappropriate behavior was a *warning sign of a substantial* change in circumstances, sufficient to invoke the authority of the district court to modify custody and visitation provisions. We therefore review the district court's decision for an abuse of discretion. *Mulkey–Yelverton*, 884 P.2d at 43.

The substantial change in circumstances we have identified was clearly the product of zealous machinations by both contestants. In this ignoble context, it is particularly foolhardy to believe that modification of custody

and visitation is appropriate to punish or reward either equally culpable contestant. The only proper objective is a modification which will serve the best interests of the children by stabilizing an environment made chaotic by thoughtlessly self-absorbed parents.

True to form, however, the parties encourage us to resolve these issues on far different bases. Pamela's claim is that the district court erred in taking exception to her sexual preference. We hold that error to have been cured by a decision which serves the best interests of the children. This case is no more about Pamela's sexuality than it is about Dean and Christine's pretentious "family values." The clash of those so-called value systems recommends neither, but did inure to the detriment of the children in a manner substantial enough to authorize the district court's modification and require our deference to that modification absent a clear abuse of discretion.

Careful reading of the contentious and unattractive record reveals no abuse of discretion. It was reasonable for the district court to conclude that limiting Pamela's visitation with the children would limit the damage done by mutual parental insistence upon use of the children as weapons in an acrimonious contest between lifestyles. Although we cannot condone the district court's indulgence of a personal viewpoint, we likewise cannot reverse a discretionary decision which is reasonable and benefits from substantial support in the record. *Thompson,* 824 P.2d at 559; *Ferguson,* 739 P.2d at 757. A substantial change in circumstances, manifested by troubled behavior in the children, was engendered by the efforts of both parties to reduce the children to mere proselytes of conflicting lifestyles. Misconstruction of the district court's decision as parental punishment or reward ignores the beneficial stabilizing effect of that decision as being in the best interests of the children.

Since its initial decision, the district court has wisely eased restrictions on Pamela's visitation rights. Even Dean and Christine admit that the bonds of love immutably link mother and children. We applaud the district court's recognition of that reality and commend the parties and the district court to a course that continues to ease practical vindication of those bonds.

## IV. CONCLUSION

Dean and Christine have justified their demonization of Pamela on religious grounds, while Pamela, with fervent zeal, seeks to justify her new sexual preference. Contrary to the fears of the parties and amici, however, it is not the dogmatic belief systems of the parents which are in jeopardy here.

The district court's judgment is not affirmed *because* of Dean and Christine's insistence upon their "values" so much as it is *in spite of* that behavior. The damage their contest with Pamela has done to these children may already be irreparable. If Dean, Christine, and Pamela cannot fully subordinate promotion of their respective lifestyles to the natural innocence and love of their children for both parents, they will quickly extinguish whatever remaining chances these children have for happy and productive lives. With that somber caveat, the judgment of the district court is affirmed.

GOLDEN, C.J., files a dissenting opinion, with whom GUTHRIE, District Judge, joins.

GOLDEN, Chief Justice, dissenting, with whom GUTHRIE, District Judge, joins.

I respectfully dissent.

In 1991, when the mother and father divorced, the court awarded primary custody of the couple's minor children to the mother and granted the father liberal visitation. Later, when the mother, a homosexual, told the father that she wished to establish a household with her companion, Peggy Keating, the parties agreed to transfer primary custody of the children to the father and to allow the mother liberal unsupervised visitation. In February, 1992, the district court entered an order to this effect which incorporated the parties' agreement.

In July, 1993, the mother and Ms. Keating had a commitment ceremony in which the mother's children participated. In August, 1993, the father and Ms. Christine Thompson married.

In late January, 1994, the father filed a petition in the district court seeking to modify the parties' divorce decree by increasing the mother's child support obligation. On March 11, 1994, the father filed an amended petition seeking to suspend the mother's visitation or to impose supervised visitation based on allegations that the mother's alternative lifestyle is contrary to the children's emotional and physical well-being, the mother and her companion engaged in inappropriate sexual conduct during the children's visitation, and the behavior of the mother and her companion during the children's visitation is psychologically and physically damaging to the children.

The district court entered a temporary restraining order which severely restricted the mother's visitation and contact with her children.

The mother denied the father's allegations asserted in his amended petition. The trial on the amended petition was held in early July, 1994. The trial court's decision letter was issued on July 21, 1994, and was incorporated by reference in the court's order of September 8, 1994, which modified the divorce decree by severely restricting the mother's visitation. As part of the decision, the court barred the mother's companion from any contact with the children. The mother has appealed the district court's decision.

In its decision letter, the district court recognized that the father had the burden to prove a substantial change of circumstances and modification of mother's visitation is in the children's best interests. In its decision letter, the district court expressly identified two, independent grounds for its decision to restrict the mother's visitation. With respect to the first ground, change in circumstances, the district court found that since February, 1992, when the court transferred custody to the father and granted liberal unsupervised visitation to the mother, these changes had occurred: (1) the mother had involved the children "in homosexual activities such as a gay rights parade and a 'commitment' ceremony between the [mother] and Peggy Keating" and (2) the "eroticization" of the children during the mother's visitation. About

the "eroticization" finding, the district court characterized it as the most evident change and relied on the opinion of the father's expert witness, Mr. Rhodes. Although it is not altogether clear from his testimony, Mr. Rhodes' usage of the term "eroticization" appears synonymous with the term "sexual abuse." Independently of its reliance on Mr. Rhodes' opinion, however, the district court found by a preponderance of the evidence that the children "have been exposed to sexual behavior inappropriate to their ages while visiting with [their mother]." The court based this finding largely on the testimony of the father and Christine who related what they had seen or heard after the children returned from visitation with their mother.

With respect to the second ground for its decision, the district court discussed the impact of the mother's lifestyle on her visitation with the children. After stating that the mother's open homosexuality

> has [created] and is likely to create confusion and difficulty for the children, and . . . is likely to negatively affect the development of the children's moral values, and because the State has an interest in supporting conventional marriages and families, . . .

the court announced "the Court would find it appropriate to reduce the [mother's] visitation with the children even if the issues of sexual abuse or eroticization were resolved."

In its review of the district court's decision, the majority concludes that the district court erred in basing its decision to restrict the mother's visitation on the mother's lifestyle. I agree with that majority conclusion; I would go further, however, and hold that the district court's expression of personal views on this subject casts sufficient doubt upon that court's capacity to remain "open to the conviction which the evidence might produce" that the district court's decision must be reversed and this matter remanded for a new trial presided over by a judge who does not hold such views.

Moving from that underpinning of the district court's decision, the majority then makes rather short shrift of the only other basis supporting the district court's decision:

the father proved that during the mother's visitation with her children she eroticized or sexually abused them. The majority concludes, and I agree, that the testimony of Mr. Rhodes, the father's expert witness, and the testimony of the father and Christine on this allegation is without value. Implicit in the majority's analysis is a determination that the district court erred in considering these witnesses' testimony at all. I agree. Mr. Rhodes was not qualified and, moreover, his categorical bias rendered his testimony worthless. Similarly, the categorical bias of the father and Christine rendered their testimony worthless. Without the testimony of these witnesses, the father's case fails.

But the majority does not stop there. Instead, it identifies a substantial change in circumstances neither advanced by the father nor found by the district court: "a lifestyle clash so intense and detrimental to the children that it rises to the threshold of a substantial change in circumstances." According to the majority, the children's inappropriate behavior "was a warning sign of a substantial change in circumstances." The majority identifies "the zealous machinations" of both the father and the mother as the cause of this substantial change in circumstances. It seems to me that the majority has far exceeded its review function and has engaged, improperly, in fact-finding. Were I the fact-finder, and I am not, I read the record differently from my colleagues. As I understand the evidence, the cause of the children's inappropriate behavior is found in the father's and Christine's "zealous machinations," not the mother's.

The record quite clearly reveals that the father and Christine worked long and hard at alienating these children from their mother. They should have been held in contempt for what they have done; instead, they are, despite the spin placed on it by the majority, rewarded for their outrageous behavior.

I find it a strange and unacceptable rule of law that the majority invokes to "limit the damage done by mutual parental insistence upon use of the children as weapons in an acrimonious contest between lifestyles." In nearly every custody/visitation case this court hears the father and mother have engaged in an acrimonious contest. But the court abandons its responsibility for reasoned and informed decision-making when it arbitrarily without reason chooses one side over the other simply to put a stop to the battle. In the majority's rush to end the battle, in the name of serving the children's best interests, it has forgotten one of the most important interests these children have: to know their mother and develop a loving and caring relationship with her. The testimony of Dr. Rachel Moriarity, a licensed psychologist chosen and then rejected by the father, was quite telling in this regard:

Q. How would the children be affected if the visitation continued to be supervised?

A. Well, I think the underlying message if visits continue to be supervised, as well as phone calls be monitored, is that this mother is not safe or okay; and I think this has deleterious effect on the children and will over the long run have an even more deleterious effect.

Q. How would it affect the children if the visitations remain very limited, to six weekends a year?

A. I think the relationship will grow more strained.

Q. Will that harm the children?

A. Yes, I believe it will.

Q. Why?

A. I feel like they will have more abandonment issues to deal with, more mistrust issues to deal with. If, indeed, this mother is safe and okay to be with, as I have concluded from my criterium in reviewing all of this information, and they continue to be supervised and things being monitored, that continues to give them the message that this is not okay, or not a safe person, and that's contrary to reality. That's contrary, making statements to a child, and that has harmful psychological effects for children.

Q. You recommended that the phone calls no longer be monitored. You feel that the monitoring of phone calls puts the children in a bind, a psychological bind. Is that why you recommended that the monitoring of phone calls be ended completely?

A. Yes. As well as these children need private time with their mother to maintain a relationship.

Q. And you also recommended that Miss Peggy Keating be involved in the children's visitation with their mother. Why did you recommend that?

A. I believe that Miss Keating is a co-parent for these children, and I saw evidence and heard evidence from other reports that the children are positively bonded to her, that she has good parenting capability also, and has a very strong relationship with the children.

Q. When you say co-parenting role, could you explain to us what you mean by that?

A. In the household with the mother, her partner, Miss Keating, is another parent for these children.

Q. Do the children in your observations and in your opinion, do the children seem very confused by the relationship between Miss Keating and their mother?

A. No, they did not. As I reported, Miriam on one occasion said, "Pam and Peggy are married. They are ladies, and they are married." Joshua on an occasion said—was talking about his mother and Peggy, and said they were kind of married. He was talking about Ohio and his friend there and the things they would do there, and he said they were kind of married.

Q. How would the children be affected if they are prevented from seeing Miss Keating?

A. Well, I think whenever we have relationships that are positive in a child's life that even, oftentimes that may be because of a person moving away or death or something like that, then we have to deal with the psychological effects of that. Certainly, we want to prevent those as much as possible because that's grief for a child. I think if these children are not allowed to see this person that they are positively bonded to and seem to have a very strong relationship with, they will have grief, and I think there is anger and sadness and more mistrust; and the more relationships that a child loses, the more mistrust they will develop over time in relationships. That's of concern.

Q. You have also recommended therapy, that therapy continue for the family. Could you explain your recommendation that the therapy be continued for the family in order to monitor alienation?

A. I think it would be very important for the father and the stepmother to be able to at the very least encourage a relationship for these children with their mother, and they may do that by doing very simple and short kind of things like it is good for you to have a relationship with your mom, or we want you to have a relationship with your mom, or this is good for you to have a relationship with your mom. That would be a step. There was no kind of initial steps like that taken in the therapy so far.

I think that it is imperative if the situation is to change that the father and the stepmother are able to encourage this kind of relationship with the children's other parent, so that would be their goal in the therapy, and the goals for the children would be to positively affect changes in visitation.

Q. What goals would you have for the mother and her partner in therapy?

A. For them to continue to understand the process the children are in and their feelings and to be able to help the children with those.

Q. Is it your observation or conclusion that this alienation will continue without therapy?

A. Yes, it is.

Q. Why do you say that?

A. Because research shows in these kind of cases that at best therapy may make some impact. At the worst there will be no change, and that's why research recommends changing of physical custody of the children in these kind of situations.

Q. I was just going to ask you your final recommendation was that if these didn't change that there would be a change in custody. That's a rather drastic measure. Did you consider that it may do more harm than good to have a change in custody for the children?

A.   Well, the research shows that it is more deleterious for the children to lose a parent and go on in a process of alienation than it is for them to have a relationship with a parent that maybe can provide a more healthy attachment.

Enough said.